The next argued case is number 17-16-66, NuVasive, Inc. v. Iancu. Mr. Rosado. Thank you, Your Honor, and may it please the Court. This is an appeal from an inter-party's re-examination proceeding challenging NuVasive's 057 patent. And the obviousness combination that's asserted is based on an amalgamation of four different references without any reasonable motivation to combine. Those references are the Kostman, Branch, Kelleher, and Koros references. Motivation to combine in this case has been challenged from the beginning of the proceeding back in 2012 and has been addressed a number of times both by the examiner and by the Board, and this appeal challenges the Board's most recent decision. There are a number of issues raised in the briefing, and I'd like to address subject, of course, to questions. One of the issues in particular where there seems to be no remaining dispute or at least some agreement, and that is on the issue of whether the Board erred in concluding that a person of ordinary skill would have been motivated to employ the neuromonitoring of the Kelleher reference in the surgical procedure, the open surgical procedure described in the Kostman reference. That's an important issue, but could we start with claim construction? Of course. I didn't argue, is NuVasive fine with the claim construction that this Court gave for the exact same term, so as path in our 2017 opinion on a different patent but very, very closely related patent? That is an appropriate construction. I don't think that resolves all the issues in the case that relate to the claim construction, but that is an appropriate claim construction. Okay, so you're fine with that claim construction. Is it your view, NuVasive's view, that the claim construction, as construed, it requires a path, an operative corridor through the nerve-rich portion of the psoas muscle, or not necessarily so? As long as the corridor goes through some portion of the psoas muscle, then that's fine. Well, okay, so that nerve-rich issue came up in the other proceeding for a particular reason, and I'm sure that's why you're asking earlier. Well, I see you arguing some of that here, too, which is why I'm just trying to drill down and understand what's going on here. Right, so I don't think it's necessary for this Court to reach that issue, and we're not asking the Court to read that in. It's certainly not necessary to resolve the issues at play in the decision in front of us. And the main issue there was there's this undisputedly broad claim construction that was used throughout the Board's decision, and used in one instance or in one way to wipe out the examiner's factual findings on secondary considerations. Okay, so here we have a reference, that teaches creating an operative corridor through the psoas muscle from the lateral side. So you're not arguing that portion of the Board's unpatentability decision. You're arguing why, in your view, it would not be obvious to have some kind of nerve monitor to be used with Kossman's practice of going through the psoas muscle laterally. Is that right? Well, I understand your question, and it raises a couple of things. So I would say for purposes of this decision, it is not necessary to do anything with the claim construction that the Board sua sponte proposed in its final decision, other than find consistent with this Court's previous decision that it's unreasonably broad. These other issues that you're touching on are hard to answer, mainly because it's hard to see from the decision, to be honest, how exactly that construction infected the Board's analysis of the prior art. I don't think it's necessary to reach that issue, because the main criticism and, in our view, one of the main problems with the prior art combination is the motivation to combine, and there simply is none. If we were to get to that issue, I know there is some evidence and arguments submitted in the record below about a retracting procedure, a surgery of Kossman that retracts the psoas. There is some testimony about whether that would be considered what surgeons typically refer to in conventional terminology as a trans-psoas procedure. It gets a little dicey. I think it is not something this Court needs to wrestle with, to be honest. Unless we disagree with you on motivation. Well, there are multiple reasons for motivation, but unless you disagree with me on motivation, there's still the issue of what did this claim construction do. That may be an issue of reversal versus remand, but to be honest, it's hard to see how this decision stands in view of the claim construction. Well, the claim construction in the 2017 invasive opinion, all it did was refine the meaning of lateral and lateral trans-psoas path. I didn't see it do anything that would displace what the Board said in this case about trans-psoas path. It's really more just about the scope of lateral, and it seemed like the Court already last year refined and constricted the scope of lateral, and that would be the only thing that would need to be touched up here with the Board's construction here, and I don't see how that refinement of the meaning of lateral impacts the analysis here, because as far as I can tell, Kosman unquestionably goes in laterally under any interpretation of the word lateral. Well, to the original point there, even if this Court disagreed and found a prima facie case, it still does infect the opinion, because how does that impact the considerations of the objective indicia? Remember that the Board here wiped out the examiner's consideration of objective indicia based on this claim construction, and that was the primary purpose of the Board construing this terminus decision. So if a wholesome, obvious analysis is going to be conducted, which it should be, then that would include this situation where a prima facie case was found, yet the comprehensive analysis includes the subjective indicia. So I think you understand my point. Any further questions on the claim construction? Okay. So I do want to touch on this issue I initially raised on motivation to combine, and particularly on the Board's factual findings and reasons why the Kelleher nerve monitoring system would allegedly be employed in the Kosman open surgical procedure. And here, there are a number of in-rain, invasive cases, and I'll try to keep them straight, but a different in-rain, invasive case, which was a precedential decision by this court, addressed the issue of clarity and specificity in an obviousness inquiry. And with regard to this issue, this stated motivation, there is not an in-rain, invasive problem in the sense that the Board's reasoning in this case was very clear and very specific, and the Board specifically found that a person of ordinary skill would have used the Kelleher nerve monitoring system specifically to detect the iliohypogastric and ilioinguinal nerves of Kosman and use that nerve monitoring system to detect and avoid those. The problem with that, among other things, as explained in the blue brief at pages 42 through 46, is that this is a theory that was never raised by the requester. It has no supporting evidence anywhere in the record, and it was something that was constructed or conjured by the Board in its final written decision. It lacks substantial evidence in the record. And there doesn't seem to be any dispute on that point. This is an issue, again, that was raised in the blue briefing, and the director chose not to defend an aspect of the decision. The director chose not to defend its briefing. There doesn't appear to be any remaining dispute on that issue. And that alone- I thought they said that your theory, raised in your blue brief, that this nerve monitor from Kelleher is not able to monitor these two particular nerves, was not anything that you have evidence to support. I thought that's what I saw in the green brief. I think that they argue incorrectly that there is a lack of evidence on some things and that, as we pointed out in our reply, is not true. Well, where in the record is there a statement, I guess from an expert of yours, that would say definitively that when it comes to these nerves, iliohypogastric and ilioinguinal nerves, they're incapable of being monitored by Kelleher's nerve monitor? Right. There is no evidence in the record anywhere from anyone that these two nerves can be monitored with the system of Kelleher. That's because that theory was never raised by the requester. It was never constructed by the examiner. This is something that showed up for the very first time in the board's final decision. It's pure conjecture. So from that standpoint, there is no evidence. The requester never constructed this theory. Their expert witness never constructed this theory. And, indeed, it doesn't make sense. Did you ask for the board to identify this as a new ground of rejection? The board designated this as final. We didn't have the opportunity to do that. It certainly is a new ground, but we don't believe this is something that specifically warrants or we would prefer we think the court can reach this decision rather than remanding it on the basis that there's nothing in the record on this point. So it's a factual finding that simply lacks substantial evidence. If we were to go back and remand, there's nothing further to be resolved on this point. There is evidence of record that does give some indication that I think this court would be more than capable of assessing that illustrates that the Kelleher system is not a system that would monitor these particular types of nerves. They're identified in the Gray's Anatomy reference, which is a record. I can find the ASA for you. I thought I understood the board's rationale to be repeating what the board said in its original board decision, which was basically all these references, prior art references, which talk about doing spinal surgeries. You want to make sure the tools that you're putting into the body don't touch any nerves. You want to have a nerve monitor connected to those tools to make sure that you know to avoid the nerves as the tools are getting closer to those nerves. That would be an obvious thing to do for any spinal surgery, including Kosman's trans-PSOAS pathway spinal surgery. I guess I'm wondering what's wrong with that basic rationale. In that original rationale, you've got to look at what they say. Their conclusion they draw from that initial discussion is that this is therefore allegedly simply using known methods for their established function. They did say that in their first decision. In this final decision, they- They block quoted it in this decision. Exactly. Then they go on to elaborate on what they believe is the established function of Kelleher. Monitoring these two types of nerves is what they identify as the established function. This is the point of law they're trying to fit this analysis into. Known things for their established function. The question is, is this the established function of Kelleher? Unquestionably, it is not. There's simply no evidence, no substantial evidence to support that point. That is the further factual finding. I guess as a general matter, when it comes to spinal surgery, there are just nerves all over the place that you have to be very sensitive about. There are specific nerves in specific places that warrant being sensitive about in particular. It was known that there were plenty of nerves running around in the PSOAS muscle. In the PSOAS muscle. There, Your Honor, the board found that was part of the argument that Newvasive advanced is that these specific nerves in the PSOAS muscle aren't where Kossman is going. So nerve monitoring is not a concern there. The board made a factual finding on that point and agreed. And that's at, let me find you the A site, but that's at A29. The board specifically, in looking at Kossman, characterized Kossman as, quote, known to be capable of being performed safely in the safe zone, even without neuro monitoring, end quote. So this was part of the argument that Newvasive was advancing below, is that Kossman is constructing a surgical approach that doesn't cause concern for particular nerve damage. It's not going where sensitive nerves are present. It can be performed safely without nerve monitoring. These surgeries are constructed based on, in part, on the tissues that they're navigating and the safest, you know, least invasive path. And Kossman is no exception to that. That's a factual finding the board made. So if Kossman can be performed without nerve monitoring safely, then it begs the question, what necessitates or what motivates employing a completely more complicated nerve monitoring system? And the answer the board provided to that was these two particular types of nerves can be monitored. That's just wrong. They can't be monitored, and there's no substantial evidence to support that. That's, and again, this is something that has not been defended and is indefensible, to be honest. I have 30 seconds remaining. There are other issues. They're brief. We'll save your rebuttal time. Let's hear from the office. Thank you, Your Honor. Mr. Hickman. Thank you, Your Honor. May it please the court. Surgeons have long known that it's important to be careful when operating around nerves, and they have long dealt with that challenge by using nerve monitoring technology. The method claimed here employs nerve monitoring technology with electrified instruments. That's what Kelleher used for his spinal surgeries, and it's also what Kelleher says can be used essentially anywhere else in the spine when a surgeon needs to navigate around nerves. The invention in the patent at issue here is Kelleher's. It's just Kelleher applied to a specific bundle of nerves in the psoas muscle. But your friend on the other side says you conceded that Kelleher can't monitor these two specific nerves that are critical here. Is that correct? No, it's not, Your Honor. I think what's going on with those two nerves is that, to step back and take a look at the anatomy, is that the lumbar plexus is the bundle of nerves that are at issue here. Much of that plexus runs through the psoas muscle itself. But the iliohypogastric and the ilioinguinal nerves are two nerves that run outside the muscle and could potentially cross the surgical field when a surgeon is coming in and trying to take a lateral approach into the psoas muscle. When the board addressed those two nerves on page 12 of the appendix, specifically in footnote 4, what I think the board was responding to was that one of the newvasive experts had apparently questioned whether Kelleher's nerve monitoring technology could actually deal with those two nerves running outside the psoas muscle. The board's rationale was it doesn't matter if it's running outside the muscle or inside the muscle. Those two nerves are still part of the lumbar plexus, and those are exactly the nerves that we're dealing with here. Whether they run inside the muscle or outside the psoas muscle, we're talking about the same plexus of nerves. Kelleher gives us every indication that it can navigate around nerves, whether they're inside the muscle or outside. Is it true that the board's decision that's on review now is the first time anywhere where anybody, including the board, raised the idea of using Kelleher's nerve monitor to monitor the iliohypogastric and ilioinguinal nerves? They said that the re-exam requester didn't argue that, nor did the examiner. Obviously, the examiner didn't. The examiner found the claim as patentable. Nor did the board in the initial decision articulate that theory of how the nerve monitor would be used. I'm just wondering, is it true that this board decision at 8-12, focusing on these two nerves, is the first time that these two nerves were identified as the rationale for why you would use Kelleher's nerve monitor? I don't think it's the first time, because I believe the board was responding to an argument that one of its experts had actually made. It was just a response to that argument. With respect to those two specific nerves, the board just said, even if those two nerves run outside the psoas muscle, we still think that Kelleher is capable of dealing with those two nerves. Judge Chen, as you had pointed out during the opening portion of the argument, Kelleher is already in the field of spinal surgery. Kelleher uses the same technology that's being claimed and described here, which is to use electrical charges to stimulate nerves. When those nerves innervate or cause the associated muscles that they're associated with to flex or to contract, that feedback loop provides the surgeon with information about whether the instrument is too close to the nerve. You can pull Kelleher and this patent side-by-side, specifically at pages 101-96 of the appendix, which is Kelleher's specification, and this specification in the 057 patent, appendix page 64 in column 12. They recite essentially the same thing that's going on with the nerve monitoring technology. I guess I'm trying to figure out what to do about the other side's argument that, well, it never had a chance to really rebut this argument that one would use Kelleher's nerve monitor to monitor these two nerves. If it had had that chance to respond to it, it would have put on evidence that Kelleher's nerve monitor, for whatever reason, is incapable scientifically to monitor these two specific nerves. I'm not sure what to do with that. It's either something that they forfeited and waived because it was in play and that they, for whatever reason, chose not to pursue it, or it was sprung on them at the last minute in the board's decision. Therefore, it seems like they didn't have an opportunity to respond to something because it was sprung on them in the last minute. Which way am I supposed to think about this? Your Honor, as I explained earlier, I don't think it was sprung on them because I think the board was just responding to an argument that they themselves had made. It was really just the same rationale that the board had applied with respect to the remainder of the nerves themselves running through the psoas muscle. So that Kelleher, that there's no difference between the nerves, whether we're talking about whether they're outside or inside the psoas muscle. But if Nuvasiv itself is the party that raised the argument, I'm not sure how it could have had the argument sprung upon it or had this theory sprung upon it. The board was simply responding to what Nuvasiv itself argued. So then you read the board's decision as saying maybe two different things? One is everybody knows in spinal surgery, any spinal surgery, you need to stay away from the nerves. Touching the nerves is a no-no. And so that's why there's these prior art references that talk about using a nerve monitor with spinal surgeries. It'd be obvious, likewise, to use nerve monitors in a spinal surgery taking a lateral trans-psoas approach, thereby rendering the claim obvious. In addition, when it comes to these two specific nerves that are referenced in Kossman, you could use Kelleher's nerve monitor to track those two nerves. Is that the way to understand the board's decision, kind of two different rationales? I think they're all wrapped up in the same rationale, and with respect to those two nerves, it was really a relatively minor point. I would also point out that this patent itself doesn't actually claim anything with respect to the iliohypogastric or the ilioinguinal nerves, and it doesn't specifically, as far as I know, the specification doesn't specifically name those nerves by name. So I don't think the scope of this patent that we're dealing with is even narrow enough to really raise that issue significantly. What about secondary consideration evidence? This is the XLIF guide, and the question of whether the board misread the import of the XLIF guide as being devoted to this claimed procedure. How I interpret Newvasive's position to be on secondary considerations is that the board, as a matter of law, should have taken Dr. Phillips's declaration and the surgical guide as they were, and not looked at any of the other evidence in the record to shed light on that surgical guide and Dr. Phillips's declaration. It does look as if the board misstated the law. I think the real question is, had the board considered all of the evidence of how this development was being received and the changes from what had come before, that it may well, as the secondary considerations traditionally do, have affected the view, the pertinence, the weight of the prior art. How does one respond to that when the board explicitly states they're not going to follow that method of analysis? Well, the board did state that it would follow that method of analysis, and there are pages in the board's decision that examine the secondary consideration evidence that Newvasive offers. But isn't the problem here that they refuse to acknowledge the nexus? I mean, there's definitely evidence, as you suggested, points to other ways of why this secondary consideration doesn't render this not obvious, but it refused to recognize that there was a nexus between the claim method and the XLF product. And that just seems to me to lack substantial evidence. I mean, you don't dispute the content of that claims chart, do you? No, the claims chart says what it says. And the claims chart specifically tracks the method of the claims to what's in the product sold by them under the XILF name, doesn't it? It does. This is even more specific information we usually get to show nexus. It reaches each and every element, doesn't it? So isn't that sufficient to show nexus? And then it's the board's obligation to go on and explain, even if there is nexus or other competing reasons, why these secondary considerations don't support a finding of non-obviousness. I would agree with you, Judge Hughes. If we still had an adversarial party below, if Globus, which was the requester in this case, if Globus had still been involved in the case and had an opportunity to rebut that claim chart and the surgical guide and chose not to or said, you know, we agree there's no issue, that that might be a different case. But what does it make a difference on whether there's a party to rebut that or not? I mean, once they've established sufficient evidence to show nexus, then nexus is presumed. And if the board can't determine, the board just has to determine based upon the record it has. And if it doesn't have evidence rebutting it, then doesn't it have to go with the nexus of this and give them proper secondary considerations? That doesn't mean it necessarily renders it non-obvious. It could still be the evidence of obviousness on the prima facie case is so strong that it's not overcome. But I don't understand how the lack of somebody on the other side makes a difference in the analysis. Well, as you mentioned, Judge Hughes, I think it's because we can assume that if there's an adversarial party, then that adversarial party would be in the best position to know whether that evidence should be rebutted, whether there's something else out there that would rebut the presumption of nexus. What the board did here was that it just sort of looked at everything in the record. And I think sort of the big consideration that counterbalances the claim chart in the surgical guide is that we have to look at sort of the overlapping nature of the products in this field. And we have method claims here, but we have products that involve methods, devices, systems. It's a very crowded field with different components. Sure, I get all that. But that's the problem with the board's analysis is it didn't do a proper nexus analysis. And you're trying to kind of backfill that with the suggestion, well, maybe the commercial success here is not due to the patent. The method claim maybe is due to the fact that, you know, this specific set of tools, that one subset is what drives the method, or that if you purchase this method, they'll throw in a bunch of tools for free. There are all kinds of reasons why the nexus can be rebutted, but it doesn't cure the error in the fact that the board said no nexus when it seems to me clearly there was nexus here. Well, what I believe, Your Honor, is that the board specifically addressed those considerations and just came to the opposite conclusion that there was no nexus because of all those reasons that I just stated. The board noted that... But that's not how a nexus analysis works, is it? I mean, the nexus is, for purposes at least of a presumption, you get it if you show the patented method is embodied by the commercial product, don't you? What you're talking about is rebutting that presumption with other evidence. But they didn't do that analysis. I mean, again, I think you're trying to... It almost sounds like you're trying to make a harmless error analysis here, but I don't understand how there's sufficient factual findings here to do that. Well, the PPC broadband, which was in the briefing, says that when there's an adversarial party, Judge Hughes, the way you described it is how it would work. But we're in a different landscape when we're only talking about one party. And my time is up, but I would say in addition to that, even if the court finds the board's objective analysis lacking here, I think that the prima facie case based on the yard is still quite strong. And for that reason, we still ask that the court affirm. Do you want to ask anything else? Okay, thank you. Mr. Rosado. Thank you, Your Honor. So on that last point, this is addressed in our briefing. But as this court will be aware, there is a presumption of nexus in inter-parties re-examination proceedings. The Glasgow versus Apple case is cited, and there certainly should be an instance where there's presumption of nexus in this case. And there really shouldn't be any presumption of some sort of reluctance to consider secondary considerations or objective evidence. This is in some ways the most important type of evidence that can be submitted in these cases, precisely because it's objective. It's not controlled by the lawyers or the parties per se. It's objective in the sense that nobody's controlling it. And what comes with that is the fact that since nobody's controlling it and lawyers aren't scripting it, you take it with the, it doesn't read like a claim. So there is a process of assessing that, and that's a process the board didn't go through here. But there is a presumption of nexus. I do want to go... Can we talk about just trying to understand the guide, just so I understand it? All the tools that are illustrated in the guide are used in the XLIF procedure, which corresponds to the patented method. Is that right? I believe that's... I don't remember every single tool that's in the guide, Your Honor. Because it says on the cover page XLIF guide or something like that, right? It does. Yeah, I think it reads XLIF surgical procedure. And it walks through the steps of that surgical procedure, and those steps map precisely to what's recited in the claim. Okay. And the tools that are illustrated in that guide, does Nuvasiv sell them, all of them just for this trans-psoas spinal procedure? Or are some of those items also sold and used for other surgeries aside from this lateral trans-psoas pathway surgery? I think those tools are designed for XLIF, the XLIF surgical procedure. Again, I'm reluctant to say. I don't remember every single tool. Like the nerve monitor, whatever that thing is called by name, does Nuvasiv sell that to people to be used just for the lateral trans-psoas type procedures? Or is that nerve monitor that Nuvasiv sells could be used or is used for other purposes? If there's an off-label use, I'm not sure, to be honest. Is the on-label use specifically only for… It is specifically for XLIF. It is a key and recognized in the marketplace as a key and critical component of the XLIF system. So all the tools, are they all basically sold together? Is that how it works? Or are some of them sort of off-the-shelf items, stand-alone packages that people can run into Nuvasiv and just buy for whatever purpose it wants to use? Or are they all used as a package and always sold as a package, and therefore you always know that whenever you have sales of your retractor system or your dilator system or your nerve monitors, we can always know that they're always going to be used for this lateral trans-psoas surgical procedure? The company is certainly able to track the sales of those components and usage with XLIF. Absolutely. I mean, is that what the data reflects, though, the actual records? The actual sales techniques? The products that Nuvasiv is selling, that the products that are part of the XLIF package, are only used for the XLIF package, so that whenever you have sales broken out for your retractors, your dilators, your nerve monitors, Nuvasiv can stand behind those records of sales and say, all of these sales are for the lateral trans-psoas path surgeries that people use these products for, and not for anything else. So that's why all of the commercial success is dedicated to the claimed invention, not for other procedures. Sure. The short answer is yes, that is trackable. It is trackable, but has it been tracked? It has been tracked. But is it, in fact, in the record? It is in the record. I think there is actually even a sales chart that was obtained through discovery with litigation with Medtronic, where Medtronic, a different company, was tracking the very sales associated with these products. So not only can Nuvasiv track it, but other players in the marketplace have no trouble tracking that information. If I may, Your Honor, can I just address... Please proceed. Thank you. So back to the nerve monitoring and the basis of the board's decision, I just want to respectfully correct a couple things. I always appreciate how the director is able to come in on these cases, but there are some factual issues that aren't quite correct in terms of the record. I would disagree that monitoring of these two nerves was a relatively minor point. I think the record is clear in the board's decision on pages A12 and A13 that this was a critical finding, and the board argued very loudly, quite frankly, that these two nerves are all that need to be monitored and no other nerves even need to be addressed. And they say that very, very explicitly in multiple locations. So this is not a minor point. This is a critical aspect of the decision. And unquestionably, this was something that did come up in the first time in the final decision, and the record is very clear on that. Nobody would have made... Dr. Lieberman, the expert on the other side, I have a hard time believing, would have made this argument even had it been contemplated, but it wasn't made. So that point is beyond dispute. And then finally, a really critical aspect of this, I actually appreciated my friend made the qualification when he was referring to Kelleher as being useful for any surgery, the qualifier being when nerves need to be monitored. And that is the critical aspect, and that ties precisely into the lack of motivation here. It cannot be said that one would just want nerve monitoring during any surgery. The key qualifier is when nerves need to be monitored, and there are many surgeries, and surgeries like Kossman, that are specifically designed to avoid problems with the nerves based on... I guess the concern I have is you have experts and declarations, and there's also background information that all say the same thing, which is going through the psoas muscle is very dangerous. There's a lot of nerves. And so your expert is saying you wouldn't be inclined to do that because of all the nerves. And so if you're going to do a trans-psoas procedure like Kossman did, it begs the question, why wouldn't you use a pre-existing known nerve monitor for other surgical pathways to the spine with a trans-psoas path? Again, we have the fortune of the most pertinent cases from this court that are relevant to this being in re-invasive, in re-invasive, in re-invasive. But I'm referring to the in re-invasive case that dealt with the motivation to combine issue, where the court emphasized that the need for specificity here pervades. There's a need for specificity in these types of analyses, and that is directly on point with what's going on here. Do you need nerve monitoring? And what is the psoas, trans-psoas approach? There is extensive evidence on this issue of going through the psoas, and when you would want to use nerve monitoring when going through the psoas, that is when you're going through the nerve-rich region. There is extensive evidence that Kossman was primarily seeking to avoid the psoas by manually retracting it. And only in the events where it couldn't be completely retracted out of the way was the surgeon bluntly dissecting with his fingers the outer fibers of the muscle. And there's testimony that those outer fibers are not a nerve-rich region, and that's why nerve damage wasn't of significant concern, and the board made the finding that I referenced earlier consistent with that point. So in that surgery, in the primary reference of Kossman, which is being sought to be modified, nerve damage is not of concern, and nerve monitoring was not necessary for a safe procedure. So, again, it comes back to the question, why would a person with a working skill be motivated to use this particular surgery in Kossman, this particular nerve-monitoring approach of Kelleher? Again, there is no need for nerve monitoring if you're thinking about the nerves through the psoas. That's why I agree with my friend here that the board pivoted in response to Nuvasiv's argument, but they pivoted to something new, and that's these two other nerves. Once they made that pivot, they ran into technical errors on whether that would be performed and a lack of evidence. So thank you, and thank you for the extra time. Thank you both. The case is taken under submission.